# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| KRISHNA REDDY, M.D., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No.: 2:16-cv-01844-SGC |
| ) | |
| STATE OF ALABAMA ) | |
| DEPARTMENT OF EDUCATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION[1]

The plaintiffs, Krishna Reddy, M.D., and Gloria Sellman, M.D., commenced this action against the defendant, the State of Alabama Department of Education, stating counts for sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and a violation of the Equal Pay Act, 29 U.S.C. § 206(d). (Doc. 1). Pending before the undersigned are the parties' cross-motions for summary judgment and the defendant's motion to strike portions of the plaintiffs' briefs in support of their summary judgment motions. For the reasons discussed below, the plaintiffs' motions for summary judgment (Docs. 30, 31) are due to be denied, the defendant's motion for summary judgment (Doc. 24) is due

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 8).

to be granted, the defendant's motion to strike (Doc. 35) is due to be denied as moot, and this action is due to be dismissed with prejudice.

**I. Material Facts**[2]

The plaintiffs are female Disability Determination Physicians employed by Disability Determination Services, a division of the State of Alabama Department of Education. (Doc. 26-1 at 3). Their comparator, Peter Sims, M.D., is a male Disability Determination Physician employed by the same state agency. (*Id.*). The position of Disability Determination Physician is assigned to Pay Grade 91 in the State's pay plan. (Doc. 32-2). Pay Grade 91 has eighteen steps. (*Id.*). Typically, appointment to the position is at Step 1. (Doc. 25 at 5 (citing Rule 670-X-8-.02 of the Alabama Administrative Code)). However, appointment above the minimum step is possible. (Doc. 26-1 at 2; Doc. 26-2 at 6). Dr. Reddy received an appointment to the position effective October 1, 2009, at Step 3, earning $122,232.00 annually. (Doc. 26-1 at 3-4). Dr. Sellman received an appointment to the position effective September 1, 2010, at the same step, earning the same annual salary. (*Id.* at 4). Dr. Sims received an appointment to the position effective December 16, 2014, at Step 14, earning $160,440.00 annually. (*Id.* at 4-5). On completion of a six-month probationary period following their respective appointments, Drs. Reddy, Sellman, and Sims each advanced two steps on the

---

[2] The following facts are undisputed, unless otherwise noted. They are viewed in the light most favorable to the non-movant, with the non-movant given the benefit of all reasonable inferences.

applicable pay grade. (Doc. 1 at 7; Doc. 26-3 at 15; Doc. 32-10 at 19-22). Thereafter, they each received a two-step merit raise each year those raises were not frozen for budgetary reasons. (Doc. 1 at 7; Doc. 26-1 at 6, 9-71; Doc. 26-2 at 7). Two steps is the maximum number of steps that may be awarded as a merit raise.[3] (Doc. 26-1 at 6; Doc. 26-2 at 7). Dr. Sims "topped out," reaching Step 18 of the applicable pay grade, on June 1, 2016. (Doc. 32-10 at 20). Drs. Reddy and Sims continue to climb the steps on that pay grade. (*Id.*).

Dr. Reddy is a board-certified neurologist. (Doc. 32-4 at 4). She practiced neurology at Birmingham Neurology, P.A. from July 1980 to her retirement in August 2005. (*Id.* at 3). During that time, she intermittently performed physical examinations for Disability Determination Services. (Doc. 32-24 at 3). Between 2007 and 2008, she was employed by the Association of Retarded Citizens, St. Clair County as a residential worker caring for three mentally disabled men[4] and by Pell City Parks and Recreation as an office worker. (*Id.* at 2-3). In May 2008, Dr. Reddy began working as a clinical research coordinator in the Department of Nephrology at the University of Alabama at Birmingham. (Doc. 27-2 at 10, 15). Dr. Reddy testified the position would normally be staffed by a registered nurse.

---

[3] Special merit raises – awarded for performance exceeding that which would justify a two-step merit raise – were frozen for budgetary reasons from January 1, 2009, to January 21, 2015 (Doc. 42-1 at 2-4), and the Department of Education has not requested a special merit raise for any of its employees since those raises were frozen in 2009 (Doc. 26-1 at 7; Doc. 26-2 at 9).

[4] She was not providing medical care to the men. (Doc. 27-2 at 8). Her caregiving role was in the nature of a supervisor. (*Id.*).

3

(*Id.* at 10). In describing her responsibilities, Dr. Reddy testified she looked at patient records, talked to patients, collected lab data and input it into a database, collected patient specimens, and performed cost studies. (*Id.* at 15). Additionally, in the latter half of 2008, Dr. Reddy began examining Veterans for neurological conditions every other Saturday for the Veterans Administration. (*Id.* at 12).

As part of the application process for the position of Disability Determination Physician, Dr. Reddy submitted a Form W-2 indicating she earned $77,908.65 during the last six months she practiced neurology at Birmingham Neurology, P.A. (Doc. 26-1 at 4; Doc. 27-2 at 10). Dr. Reddy did not submit any information regarding the pay she received as a clinical research coordinator or examining Veterans. (Doc. 27-2 at 12). She testified her salary as a clinical research coordinator was $57,000.00 annually and that she earned $230.00 per hour working approximately six hours every other Saturday for the Veterans Administration. (Doc. 27-2 at 13-14).

Dr. Sellman is a board-certified anesthesiologist. (Doc. 32-30 at 5). From 1986 to 1996, she held concurrent academic appointments and clinical positions at Georgetown University School of Medicine, the National Institutes of Health, the University of North Carolina at Chapel Hill School of Medicine, the University of Alabama at Birmingham School of Medicine, and the Children's Hospital of Alabama. (Doc. 32-30 at 6). Between 1998 and 2007, she was employed as the

chief executive officer of VectorLogics, Inc., a biotechnology company. (*Id.* at 5). From August 2008 to September 2010, she worked under contract as a medical consultant for the Department of Disability Services. (*Id.*). As part of the application process for the position of Disability Determination Physician, Dr. Sellman submitted her medical consultant contract with the Department of Disability Services. (Doc. 26-1 at 4). That contract allowed her to earn up to approximately $140,000.00 annually, although in 2009 and the first eight months of 2010 she only worked enough hours to earn $101,232.00 and $71,854.00, respectively. (Doc. 26-1 at 4; Doc. 27-4 at 17; Doc. 32-31 at 3).

Dr. Sims is a board-certified psychiatrist. Prior to his appointment to the position of Disability Determination Physician, he worked under contract as a part-time medical consultant for the Department of Disability Services for approximately fourteen years. (Doc. 27-5 at 2). Additionally, he had maintained a private practice in psychiatry since the early- to mid-1990s. (*Id.* at 3; Doc. 29-1 at 31-32; Doc. 32-10 at 11-12). As part of the application process for the position, Dr. Sims submitted documentation showing a cumulative salary in excess of $198,950.00. (Doc. 26-1 at 4).

Tommy Warren was the Director of Disability Services at the time Drs. Reddy and Sellman were appointed to the position of Disability Determination Physician. (Doc. 27-3 at 2). He recommended their appointments, as well as the

step at which each should be appointed. (*Id.*). Norman Ippolito was the Director of Disability Services at the time Dr. Sims was appointed to the position of Disability Determination Physician. (Doc. 27-5 at 2). He recommended Dr. Sims appointment and the step at which Dr. Sims should be appointed. (*Id.*). Jim Methvin is the current Director of Disability Services. (Doc. 28-3 at 1). He interviewed Drs. Reddy, Sellman, and Sims for the position of Disability Determination Physician. (*Id.* at 2). He also investigated the grievances Drs. Reddy and Sims lodged regarding their salaries. (Doc. 32-24 at 4; Doc. 32-31 at 1-5). He sent a letter to each of the plaintiffs informing her he had determined her grievance was unfounded. (Doc. 32-24 at 4; Doc. 32-31 at 1-5).

Warren, Ippolito, and Methvin testified that appointment above the minimum step of the applicable pay grade involves consideration of several factors, including an applicant's current work and past experience with Disability Determination Services and other employers. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2). They testified that whether, at the time of his or her appointment, a physician is working in a clinical setting, providing medical treatment to and interacting with patients, is extremely important in considering an above-the-minimum appointment. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2). Ippolito testified it is difficult to recruit and retain psychiatrists to work for Disability Determination Services. (Doc. 27-5 at 2). He further testified he felt it was

important for Disability Determination Services to have a full-time psychiatrist on staff to evaluate mental health claims and that it would be a great benefit to the operation of Disability Determination Services to employ a psychiatrist with Dr. Sims' experience evaluating these types of claims. (*Id.* at 2-3). It was Ippolito's understanding Disability Determination Services had never employed a psychiatrist full-time before Dr. Sims. (*Id.* at 2). Methvin echoed Ippolito's testimony that Disability Determination Services has difficulty recruiting psychiatrists and further testified Drs. Reddy and Sellman did not have a specialization that was difficult to recruit. (Doc. 28-3 at 3). Warren, Ippolito, and Methvin testified an applicant's current salary is another factor relevant to an above-the-minimum appointment but is considered only in conjunction with other factors. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2).

## II. Standard of Review

A district court must grant summary judgment if the movant shows there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings or filings it believes demonstrate the absence of a genuine issue of material fact. FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S at 323. Once the movant has met its burden, the non-

movant must go beyond the pleadings and identify specific facts showing there is a genuine issue for trial. FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court should resolve all reasonable doubts about the facts, and draw all justifiable inferences, in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the non-movant. *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. Moreover, mere conclusions and unsupported factual allegations are not sufficient to defeat summary judgment. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

### III. Discussion

#### A. Equal Pay Act Claim

An employee demonstrates a prima facie case of an Equal Pay Act violation by showing the employer paid employees of opposite sexes different wages for equal work for jobs that require equal skill, effort, and responsibility and that are performed under similar working conditions. 29 U.S.C. § 206(d)(1); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1077-78 (11th Cir. 2003). Once the employee demonstrates a prima facie case, the employer may avoid liability by proving by a

preponderance of the evidence the difference in pay is based on (i) a seniority system, (ii) a merit system, (iii) a system that measures earnings by quantity or quality of production, or (iv) any other factor other than sex. 29 U.S.C. § 206(d)(1); *Steger*, 318 F.3d at 1078. The burden to prove these affirmative defenses is heavy and requires the employer to show sex provided no basis for the difference in pay and that no decision-maker was influenced by sex. *Id.* at 1078. Once the employer has met this burden, the employee must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a sex-based pay differential. *Id.* If the employee is able to create an inference of pretext, there is an issue that should be reserved for trial. *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). Assuming Drs. Reddy and Sellman have established a prima facie case of an Equal Pay Act violation, the defendant has proved by a preponderance of the evidence that factors other than sex account for the difference in pay between the plaintiffs and their comparator, and the plaintiffs have failed to rebut this explanation.[5]

---

[5] The defendant has moved for summary judgment on a variety of grounds, including that (1) it is not a proper party to this action because the State Personnel Board, not the Department of Education, establishes pay for Disability Determination Physicians, (2) the plaintiffs have failed to establish a prima facie case of an Equal Pay Act violation, and (3) the State of Alabama's merit system is an affirmative defense to any such violation. (Doc. 25). Because the defendant has demonstrated factors other than sex were responsible for the step at which Dr. Sims was appointed as compared to the step at which Drs. Reddy and Sellman were appointed, it is not necessary to address these arguments.

The fourth affirmative defense to an Equal Pay Act violation is a "catch-all" that prevents a court for substituting its own judgment for that of an employer. *Prewett v. Alabama Dep't of Veterans Affairs*, 533 F. Supp. 2d 1160, 1176 (M.D. Ala. 2007). The Eleventh Circuit has found that factors other than sex justifying a pay differential include unique characteristics of the same job; an individual's experience, training, or ability; and special exigent circumstances connected with the business. *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988). Prior salary alone is not a legitimate reason other than sex for a pay differential. *Irby*, 44 F.3d at 955. "[I]f prior salary alone were a justification, the exception would swallow up the rule and inequality in pay among genders would be perpetuated." *Id.* (internal quotation marks omitted). However, prior salary and experience, together, may satisfy an employer's burden of proving a factor other than sex accounts for a pay differential. *Id.* ("This court has not held that prior salary can never be used by an employer to establish pay, just that such a justification cannot solely carry the affirmative defense."). The question is whether other business reasons reasonably explain the use of prior salary. *Id.*

As an initial matter, the undersigned notes the dispositive question is whether factors other than sex account for the different steps at which the plaintiffs and their comparator were appointed. From the time of their respective appointments, Drs. Reddy, Sellman, and Sims have each received the same two-

step raises. They each received a two-step raise on completion of an initial six-month probationary period. (Doc. 1 at 7; Doc. 26-3 at 15; Doc. 32-10 at 19-22). Thereafter, they each received a two-step merit raise each year those raises were not frozen for budgetary reasons. (Doc. 1 at 7; Doc. 26-1 at 6, 9-71; Doc. 26-2 at 7). Two steps is the maximum number of steps that may be awarded as a merit raise. (Doc. 26-1 at 6; Doc. 26-2 at 7). Special merit raises were frozen for budgetary reasons from January 1, 2009, to January 21, 2015 (Doc. 42-1 at 2-4), and the Department of Education has not requested a special merit raise for any of its employees since those raises were frozen in 2009 (Doc. 26-1 at 7; Doc. 26-2 at 9). The plaintiffs claim the pay gap between themselves and Dr. Sims should have been further narrowed because their work is more onerous than his and they have outperformed him. (Doc. 36 at 17-18, 23; Doc. 39 at 17-18). They further claim the gap could have been further narrowed because Disability Determination Services is federally funded and not subject to state budgetary considerations. (Doc. 36 at 25-26; Doc. 39 at 19 n.7). Both of these arguments are irrelevant. Regardless of the quantity and quality of the plaintiffs' work relative to their comparator, and whether Disability Determination Services is federally funded, the plaintiffs could not have advanced more steps on the applicable pay grade since their respective appointments. Accordingly, analysis of the plaintiffs' claims focuses on the steps at which they and their comparator were appointed.

11

### 1. Prior Experience with Disability Determination Services

The defendant has shown a variety of factors other than sex justified appointing Dr. Sims at Step 14 of the applicable pay grade, while Drs. Reddy and Sellman were appointed at Step 3. First, Dr. Sims worked part-time for Disability Determination Services as a contracted medical consultant reviewing disability applications for approximately fourteen years before he received an appointment to the position of Disability Determination Physician. (Doc. 27-5 at 2). While Dr. Sellman also worked for Disability Determination Services as a contracted medical consultant reviewing disability applications prior to her appointment, the length of that experience – approximately two years – does not compare to the length of Dr. Sims' experience. (Doc. 36 at 21). Dr. Reddy's experience with Disability Determination Services prior to her appointment was limited to intermittent physical examinations of disability applicants while working at Birmingham Neurology. (Doc. 32-24 at 3; Doc. 36 at 21).

Drs. Reddy and Sellman argue this explanation is pretextual because at the time of Dr. Sims' appointment, they had worked more hours and reviewed more cases for Disability Determination Services than Dr. Sims. (Doc. 36 at 21; Doc. 39 at 20). However, the relevant inquiry is not the amount of experience with Disability Determination Services Drs. Reddy and Sellman had accrued at the time of Dr. Sims' appointment. Rather, it is the amount of experience each physician

had with Disability Determination Services at the time of their respective appointments. The defendant has shown Dr. Sims had substantially more. Disability Determination Services had the benefit of more than a decade to familiarize itself with Dr. Sims' work, and likewise, Dr. Sims came into his position as a Disability Determination Physician with more than a decade's worth of knowledge of the position and what was expected. This was not true for the plaintiffs.

## 2. Current Clinical Experience at Time of Appointment

Second, at the time of his appointment to the position of Disability Determination Physician, Dr. Sims maintained a private practice in psychiatry. (Doc. 27-5 at 3; Doc. 29-1 at 31-32). Warren, Ippolito, and Methvin testified that whether, at the time of his or her appointment, a physician is working in a clinical setting, providing medical treatment to and interacting with patients, is extremely important in considering an above-the-minimum appointment. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2). Dr. Sellman had not treated patients for more than ten years preceding her appointment. (Doc. 32-30 at 5-6). While the parties disagree whether Dr. Reddy's employment as a clinical research coordinator could be considered clinical experience, it is undisputed Dr. Reddy was not examining or treating patients as a physician. Dr. Reddy testified the position would normally be staffed by a registered nurse. (Doc. 27-2 at 10). In describing her responsibilities,

13

Dr. Reddy testified she looked at patient records, talked to patients, collected lab data and input it into a database, collected patient specimens, and performed cost studies. (*Id.* at 15). Although her testimony is evidence she interacted with patients in a clinical setting, it demonstrates she was not examining or treating them as a physician. Dr. Reddy *was* examining Veterans for neurological conditions on behalf of the Veterans Administration at the time of her appointment, but she only performed these examinations every other Saturday. (Doc. 27-2 at 12). That limited amount of patient contact, commenced a matter of months before her appointment, is distinguishable from the regular patient contact that comes with maintaining a private practice, even part-time.

Finally, Drs. Reddy and Sellman claim they have more cumulative years of and/or greater experience examining and treating patients than Dr. Sims. (Doc. 36 at 19; Doc. 39 at 19-20). Dr. Reddy further claims she is the only Disability Determination Physician still performing clinical work. (Doc. 36 at 20). However, the relevant inquiry is the extent to which Drs. Reddy and Sellman were engaged in the practice of medicine at the time of their respective appointments. As discussed above, this consideration distinguishes Dr. Sims from Drs. Reddy and Sellman.

### 3. Specialty

Third, Disability Determination Services placed a high value on Dr. Sims' specialty – psychiatry. Ippolito testified it is difficult to recruit and retain psychiatrists to work for Disability Determination Services. (Doc. 27-5 at 2). He further testified he felt it was important for Disability Determination Services to have a full-time psychiatrist on staff to evaluate mental health claims and that it is a great benefit to the operation of Disability Determination Services to employ a psychiatrist with Dr. Sims' experience evaluating these types of claims. (*Id.* at 2-3). It was Ippolito's understanding Disability Determination Services had never employed a psychiatrist full-time before Dr. Sims. (*Id.* at 2). Methvin echoed Ippolito's testimony Disability Determination Services has difficulty recruiting psychiatrists and further testified Drs. Reddy and Sellman did not have a specialization that was difficult to recruit. (Doc. 28-3 at 3).

As evidence of pretext, Drs. Reddy and Sellman note Dr. Sims approached Disability Determination Services about the position of Disability Determination Physician, while they claim to have been recruited. (Doc. 36 at 23-24; Doc. 39 at 23). They further note the job posting to which Dr. Sims responded was not directed to psychiatrists specifically. (Doc. 36 at 24; Doc. 39 at 24). Finally, they claim Dr. Sims was "in a three-way tie for 2nd place" on a list of eligible applicants for the position of Disability Determination Physician and point out he did not

negotiate his salary. (Doc. 36 at 24; Doc. 39 at 23-24).[6] None of this evidence creates a reasonable inference Dr. Sims' specialty was not a consideration in setting his starting salary.

Additionally, Drs. Reddy and Sellman argue the defendant's reliance on Sims' hard-to-recruit specialty is a post-event justification for a sex-based pay differential because it was not identified as a justification in letters Methvin sent them informing them he had determined their grievances were unfounded. (Doc. 36 at 20; Doc. 39 at 21). While Methvin's letter to Dr. Reddy did not explicitly state it is difficult for Disability Determination Services to recruit and retain psychiatrists, it did note Dr. Sims was the first psychiatrist appointed to the position of Disability Determination Physician and identify Dr. Sims' specialty as a distinguishing feature between Dr. Sims and Dr. Reddy. (Doc. 32-24 at 3-4). Methvin's letter is consistent with the defendant's briefing of its affirmative defense.[7]

---

[6] The plaintiffs claim they attempted to negotiate for a higher salary but were told by Methvin that appointing them any higher than at Step 3 would require a lot of paperwork and delay. (Doc. 33 at 7; Doc. 34 at 6). Given that the plaintiffs acknowledge Dr. Sims did not negotiate his salary either, Methvin's alleged statement does not create an inference of pretext.

[7] Drs. Reddy and Sellman further argue the defendant does not really value experience or specialty because Victoria Hogan, M.D., was appointed to the position of Disability Determination Physician effective August 18, 2008, at Step 11 of Pay Grade 91 with no prior experience working for Disability Determination Services, at most two years of clinical experience, and no alleged hard-to-recruit specialty. (Doc. 36 at 22; Doc. 39 at 22-23). However, Warren, Ippolito, and Methvin testified current, not cumulative, experience examining and treating patients is extremely important in considering an above-the-minimum appointment. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2). Moreover, prior experience with Disability Determination Services and specialty are only two of the factors considered in determining the

16

### 4. Prior Salary

Finally, Dr. Sims' income at the time of his appointment exceeded that of Drs. Reddy and Sellman at the time of their respective appointments. In applying for the position of Disability Determination Physician, Dr. Sims submitted documentation showing a cumulative annual income exceeding $198,950.00 (Doc. 26-1 at 4), Dr. Reddy submitted documentation showing income of $77,908.65 in the first six months of 2005 (Doc. 26-1 at 4; Doc. 27-2 at 10),[8] and Dr. Sellman submitted documentation showing an income of $101,232.00 in 2009 and $71,854.00 in the first eight months of 2010 (Doc. 26-1 at 4; Doc. 27-4 at 17; Doc. 32-31 at 3). The Directors of Disability Determination Services who appointed Drs. Reddy and Sellman and Dr. Sims, respectively, testified an applicant's current salary is a consideration in determining whether to appoint him or her at a step above the minimum within the applicable pay grade but only in conjunction with other factors, including those discussed above. Although prior pay alone is not a

---

step at which an applicant is appointed. (Doc. 27-3 at 2; Doc. 27-5 at 2; Doc. 28-3 at 2). Accordingly, the example of Dr. Hogan does not create a reasonable inference of pretext.

[8] The Classification and Pay Manager for the State Personnel Department testified she used this documentation to extrapolate an annual salary of approximately $155,000.00 that would support Dr. Reddy's appointment at Step 3 of the applicable pay grade. (Doc. 26-3 at 17-18). She further testified her reliance on this documentation was in error because the State Personnel Department only accepts documentation of an applicant's current salary or salary within the prior six months. (*Id.* at 18). The defendant claims acceptable documentation – documentation showing Dr. Reddy's annual income of $57,000.00 from the University of Alabama at Birmingham and additional income from the Veterans Administration – would have required her appointment at Step 1. (Doc. 25 at 10).

defense to an Equal Pay Act violation, prior pay coupled with other legitimate factors other than sex, such as those discussed above, is. *See Irby*, 44 F.3d at 955.

Drs. Reddy and Sellman argue this explanation is pretext because it was not identified as a justification in the aforementioned Methvin letter. (Doc. 36 at 20; Doc. 39 at 21). However, Methvin's letter did note current salary was one factor relevant to an applicant's appointment above the minimum step and that Dr. Sims submitted documentation showing a cumulative annual income exceeding $198,950.00. (Doc. 32-24 at 2-3; Doc. 32-31 at 2, 4). Dr. Sellman further claims the explanation is pretext because the income Dr. Sims earned as a contractor for Disability Determination Services was used in determining the step at which he was appointed, while hers was not. (Doc. 39 at 22). She cites no evidence that supports this claim.

In sum, the defendant has established by a preponderance of the evidence that factors other than sex account for the appointment of Dr. Sims at Step 14, while Drs. Reddy and Sellman were appointed at Step 3.

**B. Title VII Claim**

Like the Equal Pay Act, Title VII prohibits wage discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). Moreover, the Bennett Amendment incorporates the Equal Pay Act's affirmative defenses into Title VII. *Prewett*, 533 F. Supp. 2d at 1185 (citing *County of Washington v. Gunther*, 452 U.S. 161, 170-

71 (1981)). Accordingly, employers may defend against a Title VII sex discrimination claim by demonstrating that factors other than sex explain a pay differential. *Prewett*, 533 F. Supp. 2d at 1185-86 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 198-201 (1974)). Where a defendant has established an Equal Pay Act affirmative defense and a plaintiff has failed to rebut it by creating an inference of pretext, that defense is dispositive of a Title VII claim based on the same underlying facts. *Prewett*, 533 F. Supp. 2d at 1186.

The Title VII claim asserted by Drs. Reddy and Sellman is based on the same facts underlying their Equal Pay Act claim. (Doc. 1). Because the defendant has established that factors other than sex account for the different steps at which the plaintiffs and their comparator were appointed, and the plaintiffs have failed to rebut this defense with affirmative evidence of pretext, the plaintiffs' Title VII claim fails, as well. *See Prewett*, 533 F. Supp. 2d at 1185-86.[9]

---

[9] The undersigned notes that in the context of their Title VII claim, the plaintiffs offer the additional argument that an intent to discriminate is evidenced by Methvin's response to their grievances regarding the inequity of their pay. (Doc. 36 at 29-30; Doc. 39 at 28-30). They describe Methvin's investigation of their grievances as scant because Methvin did not compare the annual performance appraisal scores, production rates, or job duties of the Disability Determination Physicians and did not interview or observe the work of the plaintiffs or their comparator. (Doc. 36 at 29-30; Doc. 39 at 28-30). None of these things are relevant to the determination whether sex motivated the step at which each physician was appointed. They allege Methvin told them "life isn't fair" and came across as nonchalant regarding their concerns. (Doc. 36 at 29-30; Doc. 39 at 28-30). Even assuming the allegation is true, it is not sufficiently probative to defeat summary judgment in the defendant's favor on the plaintiffs' Title VII claim.

## IV. Conclusion

For the foregoing reasons, the plaintiffs' motions for summary judgment (Docs. 30, 31) are due to be denied, and the defendant's motion for summary judgment (Doc. 24) is due to be granted. Because the statements the defendant sought to strike from the plaintiffs' briefs were not dispositive to the resolution of the parties' respective summary judgment motions, the defendant's motion to strike (Doc. 35) is due to be denied as moot. This action is due to be dismissed with prejudice. A separate final order will be entered.

**DONE** this 28th day of September, 2018.

_____
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE